UNITED STATES, for Use and Benefit of BELMONT, v. MITTRY BROS. CONST CO. et al. (TWIN FALLS NORTH SIDE INV. CO., Intervener).

UNITED STATES, for Use and Benefit of KRENGEL, v. HARKINS et al. (WILLIS et al., Interveners).

Nos. 1690, 1722.

District Court, D. Idaho, S. D.
June 20, 1933.

H. B. Redford and H. A. Baker, both of Rupert, Idaho, for plaintiff Belmont and intervener Twin Falls North Side Inv. Co.

Ray D. Agee, of Twin Falls, Idaho, for plaintiff Krengel and interveners Willis and others.

Chapman & Chapman, of Twin Falls, Idaho, for defendants.

CAVANAH, District Judge.

These cases were consolidated for trial as they were brought by the United States for the benefit of persons who furnished labor and materials against Mittry Bros. Construction Company and the Fidelity & Deposit Company of Maryland in case No. 1690, and against Willam Harkins, Mittry Bros. Construction Company, and the Fidelity & Deposit Company in case No. 1722. They were tried and argued together, and may well be disposed of by the same opinion.

In case No. 1690 about October 1, 1929, Mittry Bros. Construction Company entered into a contract with the United States for the construction of the Millner Canal diverting water from Snake river. The work is known as "The Gravity Extension of the Minidoka Reclamation Project." The Fidelity & Deposit Company executed, under the act of Congress (40 USCA § 270), the standard government form of performance bond. The Twin Falls North Side Investment Company has intervened and seeks to recover for hay sold and on a number of assigned claims for labor and material used in the prosecution of the work. About July 1, 1930, William Harkins entered into a subcontract with Mittry Bros. Construction Company for the construction of a section of the canal across a depression requiring dirt to be hauled in, and which was situate a considerable distance from any town where adequate boarding facilities could be had for the men. Camp No. 2 was established where the men and horses employed were cared for and fed, and groceries for the camp were furnished from Longinberger & Belmont at Hazelton.

In case No. 1722, the situation is practically identical with case No. 1690, except as to the different part of the canal that was under construction. The contract there between Mittry Bros. Construction Company and the United States was entered into on May 27, 1929, and the bond given by the Fidelity & Deposit Company to secure performance of the contract was on June 1, 1929. A number intervened seeking to recover for labor and materials furnished and used in the prosecution of the work which was carried on at camp No. 1. The work performed in that case was completed first, and then the same employees and horses used there were moved down on camp No. 2 and continued the work covered by the contract referred to in case No. 1690.

· The defendants contend:

(a) In case No. 1722 the suit was not timely brought.

(b) If plaintiff and interveners are entitled to recover, they are only entitled to interest on their claims from date of suit.

(c) Materials and supplies furnished by claimants and used in the boarding house maintained by the subcontractor Harkins are not recoverable under the bond. ·

(d) Payments made by subcontractor Harkins must be applied to those claims covered by the bond.

(e) Only those who furnished labor and material that went into the construction covered by the bond come within the benefit of the act.

These contentions will be disposed of in their order.

A. Case No. 1722 was commenced on February 26, 1932, and the complaints in intervention were filed on March 5, 1932. There was one contract and bond covering all of the work, which was completed and finally settled on°March 16, 1931. The contract and specification 489 are divided into Schedules 2, 3, 4, 8, and 9, which the United States paid Mittry Bros. for the work performed thereunder, on Schedule 2 on October 9, 1930, on Schedules 3 and 9 on November 4, 1930, on Schedule 4 on March 16, 1931, and on Schedule 8 on April 3, 1930. The last payment made by the United States for work done on that contract was for final settlement of Schedule 4, and was the last schedule to be completed and settled for under the contract. Thus the evidence discloses that the completion and final settlement of the contract was on March 16, 1931, as determined by the proper authority of the government, and the

action was commenced on February 26, 1932, within a period of one year as required by the statute. The statute does not contemplate the running of it from the time the schedules are completed but from the date of the completion and final settlement of the entire contract, and those who have furnished materials and labor used in the construction of the work may bring their suit within the one-year period.

The statute we are considering (40 USCA § 270) provides: "That where suit is instituted by any of such creditors on the bond of the contractor it shall not be commenced until after the complete performance of said contract and final settlement thereof, and shall be commenced within one year after the performance and final settlement of said contract, and not later." The words "final settlement and complete performance" used in the statute relate to the time when the amount due under the contract is determined by the appropriate administrative authority and when the work covered by the contract has been finally completed. Illinois Surety Co. v. U. S., to Use of Peelér, 240 U. S. 214, 36 S. Ct. 321, 60 L. Ed. 609; Mandel v. U. S. (C. C. A.) 4 F.(2d) 629.

The defendants assert that, as bids were considered by the United States on all or any number of the schedules and bidders could make stipulations as they desired regarding combinations of schedules, and when each schedule was completed the work thereunder was paid for, shows that they were separate and distinct contracts as to each schedule, and that, as Harkins having performed all of his work upon Schedules 2, 3, 8, and 9, and having performed no work upon Schedule 4, suit was filed too late. This argument would, without doubt, prevail had the United States entered into separate contracts for each schedule, but that was not done, as there was but one contract entered into between the United States and Mittry Bros. Construction Company covering all of these schedules, which included Schedule 4 that was completed and final settlement made by the appropriate administrative authority of the government on March 16, 1931, and brings the commencement of the action within the statutory period of one year. We must not forget that the bond sued upon here was given to secure the entire contract between the United States and Mittry Bros. Construction Company covering all of the schedules and not a portion of them. The mere fact that the United States called for bids for each schedule and settled for the work done

under each as the work progressed would not justify the conclusion that there was a separate contract as to each schedule.

**B.** The theory upon which a surety on a bond is held liable for interest is determined by the laws of the state allowing interest at the rate of 7 per cent. per annum from the date the account becomes due. Section 26-1904, I. C. A. The Supreme Court has settled this question in the case of Illinois Surety Co. v. John Davis Co., 244 U. S. 376, 37 S. Ct. 614, 617, 61 L. Ed. 1206, where it is said: "The contract and bond were made in Illinois and were to be performed there. Questions of liability for interest must therefore be determined by the law of that state. Scotland County v. Hill, 132 U. S. 107, 117, 10 S. Ct. 26, 33 L. Ed. 261, 265. Under the law of Illinois the liability of a surety on a bond is extended beyond the penalty by way of interest from the date when the liability on the bond accrued. Holmes v. Standard Oil Co., 183 Ill. 70, 55 N. E. 647. See United States v. U. S. Fidelity Co., 236 U. S. 512, 530, 531, 35 S. Ct. 298, 59 L. Ed. 696, 704, 705." See, also, State v. Title Guaranty & Surety Co., 27 Idaho, 752, 152 P. 189; United States, to Use of Taylor v. Fidelity & Deposit Company (D. C.) 4 F. Supp. 211; 50 C. J. 90.

**The** surety company urges that the amount each claimant is to receive, if any, has at all times been in dispute, and could not have been made definite until it was actually decided by the court, and no demand was made upon it for payment until suit was commenced, and therefore should not bear interest until from the commencement of suit. This contention seems to have support in the cases of Illinois Surety Co. v. John Davis Company, supra; United States v. United States Fidelity & Guaranty Co., 236 U. S. 512, 35 S. Ct. 298, 59 L. Ed. 696; and United States, for Use of Baltimore Cooperage Co. v. McCay (D. C.) 28 F.(2d) 777, and whatever claims are recoverable under the bond will bear interest at the legal rate allowed by the state statute from the time of the commencement of the suit.

**C.** The work Harkins was engaged to do was located between the towns of Dietrich and Eden and about fifteen miles from Eden and ten miles from Dietrich. There was no boarding house at these towns, making it necessary for the subcontractor to provide board and lodging for the laborers. Groceries and provisions and feed for the horses were used in the prosecution of the work. The disputed question is whether the camps where the work was done were located at such distances from any place where these supplies for boarding the men and feeding the horses could be secured that they had to be transported. A boarding house conducted by the subcontractor as an independent enterprise, undertaken solely for an additional profit and not as an integral part of the work, and involving in it the furnishing of the groceries consumed by the men on the work and feed for the horses, would not be materials supplied and used in the prosecution of the work to establish the condition essential to liability on the bond. These camps were located in the desert and at the site of the work. Practically all of the work done was with horses, making it impractical to have driven them from these towns every day and return for care, feed, and water. The transporting of the men to and from the towns would have been costly, as they would have had to have been transported in trucks, and the supplies furnished under the circumstances were necessary and clearly used in the prosecution of the work.

**D.** The case is controlled by the federal act and the obligations of the bond which requires payment to all persons supplying labor and material in the construction of the work contemplated by the contract, and includes, not only the contractor and subcontractor, but any one who furnishes labor and material to the contractor or subcontractor used in the construction of the work contracted for. U. S., for Use of Hill v. American Surety Company, 200 U. S. 197, 26 S. Ct. 168, 50 L. Ed. 437; Mankin v. U. S. to Use of Ludowici-Celadon Company, 215 U. S. 533, 30 S. Ct. 174, 54 L. Ed. 315; Illinois Surety Company v. John Davis Co., 244 U. S. 376, 37 S. Ct. 614, 61 L. Ed. 1206.

It appears that Harkins had prior to July and August, 1930, done other work for Mittry Bros.; that payments on account were made at frequent intervals without indicating they were made for services rendered under any particular contract. In their dealings payments were applied to the payment of claims in the order of their accrual. The evidence is silent as to Mittry Bros. paying Harkins any of the money received from the government on the contract. Harkins was receiving money at the same time from Mittry Bros. under the Phillips subcontract. Mittry Bros. were unable to say where the money was used when they paid Harkins on the bonded contract. The creditors who were dealing with Harkins were unacquainted with the various dealings between Mittry Bros. and

Harkins. It will be remembered that Mittry Bros. had two contracts with the government which were insured by the defendant surety company and the same creditors furnished materials and performed labor on both jobs. It would therefore seem to make no difference so far as the liability of the defendant surety is concerned how the application of the payments are applied. If the creditors had applied the payments during July and August, 1930, to payment of bills for materials delivered at camp 2 during those months, and had treated bills for like amounts delivered to camp 1 unpaid, the defendants would still have been liable to the same creditors in the same amounts but under both contracts. If the surety is permitted to direct the application of the payments, it could only be to avoid a loss to it. Such would not be the case here, for the defendants were answerable for the obligations upon which the payments were applied. In a transaction like this, the surety had ample facilities for protecting itself. It could have reserved and exercised a surveillance over the disbursement of the proceeds of the contract for the performance of which it is surety. Those furnishing labor and materials could not do so. They have a right to rely upon the bond to protect them against such contention here made under the statute and conditions of the bond. The bond specifies that the contractor will pay all materials and labor claims, and, in the event they are not paid, the surety will respond. Maryland Casualty Co. v. City of South Norfolk (C. C. A.) 54 F.(2d) 1032; Standard Oil Co. v. Day, 161 Minn. 281, 201 N. W. 410, 41 A. L. R. 1291; Salt Lake City v. O'Connor, 68 Utah, 233, 249 P. 810, 49 A. L. R. 941; City of Marshfield v. United States Fidelity & Guaranty Co., 128 Or. 547, 274 P. 503; Grover v. Board of Education of Franklin Tp., 102 N. J. Eq. 415, 141 A. 81.

 Under the evidence and in absence of agreement, the surety has no right to compel the application of payments which it has made, as the rule is that, "if the debtor designates the application of payments, his designation is controlling with respect to both the creditor and the surety. If the debtor does not designate the application of payments, the creditor may apply them to any portion of the indebtedness, and the surety has no right to insist on application to the debt for which he is liable." 50 C. J. 104.

"A debtor may control the application of his payments. If he fails to make the application, the power to do so devolves upon the creditor. If neither does so, it becomes the duty of the court to make the application, and in doing this it must be guided by a sound discretion. It is equitable that the entire debt be paid." Delaware Dredging Co. et al. v. Tucker Stevedoring Co. (C. C. A.) 25 F.(2d) 44, 46.

The payments here made were applied to the discharge of an obligation for the payment of which the defendants were liable.

E. We approach the consideration of what labor and materials went into the construction covered by the bond. Certain items are claimed by defendants in both suits as not lienable under the bond, and, after a consideration of them, the following conclusion is reached:

C. H. Krengel's claim in suit No. 1722 covers a large number of different kinds of materials. The question is as to the segregation of the items of this claim as to when materials and horses were furnished. It appears that some of the materials and horses were furnished and used prior to November 1, 1929, and some subsequent to that date. Harkins during that fall operated camp No. 1 under contract with Mittry Bros., and at the same time operated a camp under a subcontract that he had from John Phillips located about two miles from camp 1. In August he commenced work on the contract with Mittry Bros., and closed that work about Christmas. He finished the work on the Phillips contract on November 1. About two-thirds of the horses and equipment were used on the Phillips job and one-third on the Mittry Bros. job, so under the evidence the court can only prorate the items as between the contract direct with Mittry Bros. and the subcontract with Phillips. So the items should be so prorated between the Phillips subcontract and the contract with Mittry Bros. The claim is allowed for $222.57.

 E. J. Hunt & Sons (intervener in suit No. 1722) claim covers purchase price of mules and horses and rental for five teams and dump wagon. The surety is not liable for the purchase of equipment, and therefore the item in this claim of $105 covering the purchase price of mules and horses is disallowed, and the items of $238.78 and $30 for rental of the teams of work horses and dump wagon are allowed, and, as there was paid on this claim the sum of $125, there is a balance allowed of $143.70.

 H. K. Belmont (surviving partner of plaintiff in suit No. 1690) claim covers groceries used at camp 2. This claim is allowed

less the amounts charged for snuff, gloves, cigarettes, tobacco, and candy, amounting to $40.95 for the month of August, 1930, and $58.70 for July, 1930, leaving a balance owing of $246.87 for July, 1930, and $172.17 for August, 1930.

Jess Willis (intervener in suit No. 1722) claim for labor performed. Amount allowed $192.75.

Miller Tipton (intervener in suit No. 1722) claim covers labor performed. Amount allowed $73.75.

U. F. McCarley (intervener in suit No. 1722) claim covers labor performed. Amount allowed $18.88.

Fred Taylor (intervener suit No. 1722) claim covers labor performed. Amount allowed $228.25.

E. M. Willis (intervener suit No. 1722) claim covers labor performed. Amount allowed is $67.91, and the further sum of $186.29 for rental of horses.

J. T. Blankenship (intervener in suit No. 1722) claim covers labor performed. Amount allowed $125.

Joseph Houshka (intervener suit No. 1722) claim covers hay furnished. Amount allowed $56.

C. A. McMaster (intervener suit No. 1722) claim covers team hire. Amount allowed $265.

Twin Falls North Side Investment Company (intervener suit No. 1690) claim covers hay furnished. Amount allowed $150.

R. W. Talley (intervener suit No. 1690) claim covers hay furnished. Amount allowed $111.43.

E. R. Gage (intervener suit No. 1690) claim covers hay furnished and rental of horses. Amount allowed $395.

J. M. Biggs (intervener suit No. 1690) claim covers hay furnished. Amount allowed $45.

B. F. Badger (intervener suit No. 1690) claim covers supplies furnished boarding house at camp No. 2. Amount allowed $287.

Consolidated Wagon & Machine Company (intervener suit No. 1690) claim covers supplies furnished. Amount allowed $40.07.

William McCandless (intervener suit No. 1690). This claim is disallowed.

John A. Bennett (intervener suit No. 1690) claim covers labor performed. Amount allowed $165.50.

Paul Bryant (intervener suit No. 1690). Amount allowed $105.

M. Tipton (intervener suit No. 1690) claim covers labor performed. Amount allowed $177.50.

F. McCarley (intervener suit No. 1690) claim covers labor performed. Amount allowed $51.70.

Stanley Miller (intervener suit No. 1690) claim covers labor performed. Amount allowed $130.

Jacob Yeager (intervener suit No. 1690) claim covers work performed. Amount allowed $124.75.

E. M. Willis (intervener suit No. 1690) claim covers labor performed. Amount allowed $189.37.

Jess Willis (intervener suit No. 1690) claim covers labor performed. Amount allowed $60.13.

L. E. Foster (intervener suit No. 1690) claim covers labor performed. Amount allowed $100.

Fred Taylor (intervener suit No. 1690) claim covers work performed. Amount allowed $55.

D. A. Wright (intervener suit No. 1690) claim disallowed.

L. G. Kirkman (intervener suit No. 1690) claim covers labor performed and horses rented. Amount allowed $119.

A. M. Sande (intervener suit No. 1690) claim covers merchandise furnished. Amount allowed $449.65.

C. A. McMaster (intervener suit No. 1690) claim covers rental of teams and horses at camp No. 2. Amount allowed $225.

J. T. Blankenship (intervener suit No. 1690) claim covers labor performed. Amount allowed $97.50.

Preston Weiss (intervener suit No. 1690) claim covers labor and horse hire. Amount allowed $31.42.

Bryon Weiss (intervener suit No. 1690) claim covers labor performed and rental of horses. Amount allowed $88.50.

T. R. Weiss (intervener suit No. 1690) claim covers labor performed and rental of horses. Amount allowed $62.

In view of the conclusions thus reached, findings and decree may be prepared and presented in the above cases in which plaintiff and interveners are entitled to judgment in the amounts above stated, with interest thereon at the rate of 7 per cent. per annum from date of bringing suit and filing complaints in intervention.